# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | CRIMINAL No. 10-145-02 |
| : | |
| SHAWN EDWARDS, : | |
| a/k/a "Shiz" : | |

## MEMORANDUM

**Norma L. Shapiro, J.**					March 7, 2011

## I.	Introduction

Before the court is defendant's motion for determination of separate conspiracies and the government's response in opposition. Shawn Edwards ("Edwards") is charged with participating in a conspiracy with four other defendants to commit bank fraud and identity theft. The alleged conspiracy was led by co-defendant William Ford ("Ford"), who recruited three bank tellers to provide him with copies of legitimate checks processed at their respective financial institutions. Ford used the purloined checks to forge bogus checks cashed at the originating banks by persons recruited by his co-conspirators. The conspiracy allegedly defrauded three banks (Wachovia, Commerce and First Penn) through schemes overlapping in both time and personnel. From December 2004 until June 2006, the scheme targeted Wachovia Bank, and was perpetrated by Ford, Andre Taylor ("Taylor") and Christopher Victor-Canty. From March 2006 until August 2006, the scheme expanded to include Commerce Bank; Ford, Edwards, Timothy Victor-Canty and Taylor participated in the Commerce Bank fraud. The First Penn scheme operated from May 2006 until July 2006, and involved Ford, Timothy Victor-Canty and Taylor. Edwards, in custody

1

from January 25, 2002 until March 13, 2006, participated in the Commerce Bank fraud only.

At Edwards' change of plea hearing, the court questioned whether the indictment alleged multiple conspiracies, with Edwards only participating in one of them. Relevant Supreme Court and Third Circuit case law establish a defendant's right "not to be tried en masse for the conglomeration of distinct and separate offenses committed by others" when the evidence "obviously confuses the common purpose of a single enterprise with the several, though similar, purposes of numerous separate adventures of like character." *Kotteakos v. United States*, 328 U.S. 750, 775 (1946); *id*. at 769.

## II. Single Versus Multiple Conspiracies

The seminal single versus multiple conspiracy case is *Kotteakos v. United States*, 328 U.S. 750 (1946). In *Kotteakos*, the indictment named 32 defendants as co-conspirators in a scheme to defraud the Federal Housing Administration ("the FHA") by obtaining false documents from various financial institutions. *Id*. at 752-53. Simon Brown "was the common and key figure in all of the transactions proven." *Id*. at 753. The other indicted co-conspirators were largely aided by Brown in defrauding the FHA one time. They "did not have any relationship with one another, other than Brown's connection with each transaction." *Id.* at 754. The pattern was that of "separate spokes meeting at a common center . . . without the rim of the wheel to enclose the spokes." *Id*. at 755. It was admitted by the parties and every member of the court that the proof "made out a case, not of a single conspiracy, but of several, notwithstanding only one was charged in the indictment." *Id*. The issue was whether the error to the defendants in being charged as members of a single conspiracy was harmless; the Court held it was not and therefore reversed and remanded the disputed judgments. *Id*. at 776.

In *Blumenthal v. United States*, 332 U.S. 539 (1948), the Court again examined an indictment charging a single conspiracy; four petitioners challenged their convictions for involvement in a conspiracy to sell whiskey at prices above the ceiling set by the Emergency Price Control Act. The Court acknowledged "the law rightly gives room for allowing the conviction of those discovered upon showing sufficiently the essential nature of the plan and their connections with it, without requiring evidence of knowledge of all its details or of the participation of others." *Id.* at 557. Each whiskey "salesman aided in selling only his part," but they formed part of a single conspiracy, because they "knew or must have known that others unknown to them were sharing in so large a project." *Id*. at 558-59. The Court noted the petitioners, by their "separate agreements . . . became parties to the larger common plan, joined together by their knowledge of its essential features and broad scope, though not of its exact limits, and by their common single goal." *Id*. at 558.

The Court distinguished *Kotteakos*, because there "no two . . . agreements were tied together as stages in the formation of a large all-inclusive combination, all directed to achieving a single unlawful end or result." *Id*. Because the *Blumenthal* conspirators "by reason of their knowledge of the plan's general scope, if not its exact limits, sought a common end," there was "a single conspiracy [to sell whiskey at above-authorized prices] of which the several agreements were essential and integral steps." *Id*. at 559. The Court affirmed their convictions on the sole conspiracy count. *Id*. at 560. *Kotteakos* and *Blumenthal* together suggest a common relation with a hub is not sufficient to find a single conspiracy among disparate spokes; the spokes themselves must be interrelated and share a common purpose.

Multiple conspiracies are defined as "separate networks operating independently of each

3

other." *United States v. Barr*, 963 F.2d 641, 648 (3d Cir. 1992). A "finding of a master conspiracy with sub-schemes does not constitute a finding of multiple, unrelated conspiracies." *United States v. Smith*, 789 F.2d 196, 200 (3d Cir. 1986). The "relatedness of the activities of the co-conspirators in support of the overall illegal scheme can defeat a claim of multiple conspiracies." *United States v. Perez*, 280 F. 3d 318, 346 (3d Cir. 2002). A "single conspiracy can involve one pivotal figure who directs illegal activities while various combinations of other defendants further those activities in different ways and at different times. A single conspiracy finding does not require every member to participate in every transaction" *United States v. Padilla*, 982 F.2d 110, 115 (3d Cir 1992) (citation omitted).

*United States v. Kelly*, 892 F.2d 255 (3d Cir. 1989), stated a three-factor test to determine whether a group of individuals engaged in a single conspiracy or multiple conspiracies. A court should consider: (1) "whether there was a common goal among the conspirators;" (2) "whether, looking at the nature of the scheme, the agreement contemplated bringing to pass a continuous result that w[ould] not continue without the continuous cooperation of the conspirators;" and (3) "the extent to which the participants overlap in the various dealings." *Id*. at 259. The absence of one of these factors "does not necessarily defeat an inference of the existence of a single conspiracy." *Padilla*, 982 F.2d at 115.

In *United States v. Greenidge*, 495 F.3d 85 (3d Cir 2007), the court of appeals applied the *Kelly* criteria in concluding a scheme similar to that alleged in the instant case constituted a single conspiracy. The lead conspirator, Melvyn Waldron ("Waldron"), obtained stolen checks from mail rooms and post offices and arranged for those checks to be altered and deposited into various accounts so the proceeds could be withdrawn. *Id*. at 89-90. Waldron gave the checks to

4

a middleman who gave them to another co-conspirator to alter the payee names on the checks in exchange for a fee. *Id*. at 90. "Recruiters" solicited "depositors" who were willing to use their personal or business bank accounts to deposit the stolen and altered checks in order to make them appear legitimate. *Id*. Recruiters and depositors appealed their convictions for participation in a single conspiracy.

The *Greenidge* court noted "evidence of a common goal among the [alleged] co-conspirators: to make money by depositing stolen and altered corporate checks into business accounts." *Id*. at 93. The court held there was a single conspiracy; the activities of one group were necessary or advantageous to the success of another aspect of the scheme or to the overall success of the venture. *Id* at 95. (citing *Kelly*, 892 F.2d at 259) (citations omitted). The extent of participant overlap weighed in favor of a single conspiracy because the checks the petitioners deposited "came from the same source . . . and they were altered by the same person . . . for the same reason (to pass the scrutiny of the banks)." *Id* at 94. Also, the scheme employed "the same network of recruiters . . . to find depositors." *Id*.

The conspiracy alleged in the instant indictment is similar to *Greenidge*. In both actions, an organizer arranged for checks to be altered and then cashed by recruited depositors. These "middle tier" co-conspirators then recruited depositors who cashed the doctored checks. Proceeds were split among the depositors, recruiters and organizer.

Edwards was involved in a sub-scheme within a single conspiracy. The indictment adequately alleges a common goal: making money by cashing stolen and altered checks at various banks. Edwards' activities were necessary or advantageous to the success of another aspect of the scheme or to the overall success of the venture. Without Edwards' recruitment of

5

willing co-conspirators, the operation would not have been as profitable. Finally, there was a substantial amount of participant overlap. Ford was the leader of the entire scheme; Taylor, with at least one of the Victor-Canty brothers, perpetrated the scheme at all three banks. Unindicted co-conspirator Gladisha Echevarria worked as a teller at both Wachovia and Commerce Banks. Edwards has a weaker argument for multiple conspiracies than the unsuccessful appellants in *Greenidge*, because the corresponding *Greenidge* conspirators each made only a single fraudulent deposit, while Edwards participated in a number of fraudulent deposits.

Edwards joined an ongoing conspiracy upon his release from prison and only helped effectuate the scheme with regard to Commerce Bank, but there was a single conspiracy "involv[ing] one pivotal figure who direct[ed] illegal activities while various combinations of other defendants further[ed] those activities in different ways and at different times." *Padilla*, 982 F.2d at 115. Edwards and his co-conspirators, by their "separate agreements . . . became parties to the larger common plan, joined together by their knowledge of its essential features and broad scope . . . and by their common single goal." *Blumenthal*, 332 U.S. at 558.

Edwards' minimal role should be taken into account in sentencing. Section 3B1.2 of the Sentencing Guidelines Manual permits "adjustments to a defendant's offense level based on the role that he played in committing the offense." *United States v. Isaza-Zapata*, 148 F.3d 236, 238 (3d Cir. 1998). The reduction is available for a defendant whose role in the offense makes him substantially less culpable than the other participants. *See U.S. Sentencing Guidelines Manual* § 3B1.2 cmt. background. Such factors as a defendant's lack of knowledge or understanding of the overall enterprise and of others' activities are evidence of a minimal role in the offense. *Id*. The court of appeals has interpreted Section 3B1.2 to "limit[] accomplice attribution to conduct

committed in furtherance of the activity the defendant agreed to undertake." *United States v. Collado*, 975 F.2d 985, 997 (3d Cir. 1992). In formulating a sentence, "conduct that occurred before the defendant entered into an agreement cannot be said to be in furtherance of or within the scope of that agreement."[1] *Id*.

The indictment properly charges a single conspiracy; Edwards' motion for determination of separate conspiracies will be denied. An appropriate order follows.

---

[1] The court must also heed 18 U.S.C. § 3553(a)(6)'s mandate that it "consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."